**Oral Argument Not Yet Scheduled**

IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**14-7041**

◆◆

GSS GROUP LTD., also known as Global Security Seals Group Ltd.,

*Petitioner-Appellant,*

—v.—

REPUBLIC OF LIBERIA and NATIONAL PORT AUTHORITY OF LIBERIA,

*Respondents-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## BRIEF FOR PETITIONER-APPELLANT

CHARLES B. WAYNE
DLA PIPER US LLP
500 8th Street, NW
Washington, DC 20004
(202) 799-4000
charles.wayne@dlapiper.com

*Attorneys for Petitioner-Appellant*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellant GSS Group Ltd. ("GSS") hereby submits this Certificate as to Parties, Rulings and Related Cases.

Parties and Amici:

The parties named in the District Court Case, *GSS Group Ltd. v. Republic of Liberia and National Port Authority of Liberia,* Case No. 1:12-cv-00332-PLF (D.D.C.), who are now parties to this appeal, are listed below.

GSS Group Ltd. is Petitioner-Appellant.

Republic of Liberia ("Liberia") and National Port Authority of Liberia ("NPA of Liberia") are Respondents-Appellants.

There are no amici.

GSS is a privately-held entity organized under the laws of the territory of the British Virgin Islands.

Liberia is a sovereign foreign state. The NPA of Liberia is a public corporation registered under the laws of Liberia and an agency or instrumentality of the Government of Liberia.

Rulings Under Review:

Petitioner GSS filed an amended petition to confirm a foreign arbitral award. Respondents Liberia and NPA of Liberia filed a motion to dismiss the amended

petition.  On March 11, 2014 Judge Paul L. Friedman granted Respondents'

motion to dismiss the amended petition.  GSS appeals that decision, and the

ensuing March 11, 2014 Order of Dismissal.

This case has not previously been before this Court.

Related Cases:

There are no cases related to this matter.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

petitioner-appellant GSS Group Ltd. is a privately-owned corporation.

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION ......................................................................1

STATEMENT OF THE ISSUES ........................................................................1

STATEMENT OF THE CASE ...........................................................................2

    Nature of the Case..................................................................................2

    Course of the Proceedings ......................................................................5

    The Decision Below................................................................................7

STATEMENT OF THE FACTS .........................................................................12

    A.    The Arbitration Proceedings.................................................12

    B.    Liberia's General Control Over the NPA of Liberia .....................16

    C.    Liberia's Cancellation of the Project Agreement ...........................18

SUMMARY OF THE ARGUMENT ....................................................................23

STANDARD OF REVIEW ..............................................................................24

ARGUMENT................................................................................................24

I.    The Amended Petition States A Valid Claim Against The Republic of Liberia........................................................................................................24

    A.    Liberia is the Principal........................................................24

    B.    Liberia Did Not Act as Regulator.....................................28

    C.    Equity Renders Liberia Bound by the Arbitral Awards .................30

II.    The Amended Petition States A Valid Claim Against the NPA of Liberia........................................................................................................32

III.    Alternatively, The Court Should Remand The Action To Allow Discovery....................................................................................................34

CONCLUSION ............................................................................................34

# TABLE OF AUTHORITIES

Page(s)

C<small>ASES</small>

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
   425 U.S. 682 (1976)........................................................28

*Bridas S.A.P.I.C. v. Government of Turkmenistan,*
   345 F.3d 347 (5th Cir. 2003) ......................................11, 31

*\*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
   462 U.S. 611 (1983) ("*Bancec*").......................... 3-11, 23, 24, 30, 31

*\*Foremost-McKesson v. Islamic Rep. of Iran,*
   905 F.2d 438 (D.D.C. 1990) ......................................7, 34

*GSS Group Ltd. v. Nat'l Port Auth.,*
   2014 WL 930790 (D.D.C. Mar. 11, 2014) ............. 2, 7-11, 18, 22, 25-29, 31-34

*GSS Group Ltd. v. Nat'l Port Auth.,*
   680 F.3d 805 (D.C. Cir. 2012).........................3, 5, 11, 32

*GSS Group Ltd. v. Nat'l Port Auth.,*
   774 F. Supp. 2d 134 (D.D.C. 2011)...................................3

*Price v. Socialist People's Libyan Arab Jamahariya,*
   294 F.3d 82 (D.C. Cir. 2002) .......................................3

*S & Davis Int'l Inc. v. The Repub. of Yemen,*
   218 F.3d 1292 (11th Cir. 2000) ......................................28

*TMR Energy Ltd. v. State Property Fund of Ukraine,*
   411 F.3d 296 (D.D.C. 2005) .......................................5, 32

*\*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
   200 F.3d 843 (D.D.C. 2000).......................................7-10, 24-29, 31

\* Authorities upon which we chiefly rely are marked with asterisks.

i

**STATUTES**

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1601 ................................................................................1

9 U.S.C. § 201 ...................................................................................3

**RULES**

Fed. R. Civ. P. 12(b) ...................................................................1, 6, 7

Fed. R. Civ. P. 30(b)(6)..........................................................................6

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF AGENCY § 1 ..............................................25

RESTATEMENT (SECOND) OF JUDGMENTS § 27 .......................................33

## STATEMENT OF JURISDICTION

This Court has jurisdiction because the district court's judgment dismissing the action and order granting the motion of respondents the Republic of Liberia and the National Port Authority of Liberia, pursuant to Fed. R. Civ. P. 12(b), to dismiss the amended petition to confirm foreign arbitral awards filed by petitioner GSS Group Ltd. ("GSS"), are final in accordance with 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Did the district court err in dismissing the amended petition against the *Republic of Liberia* ("Liberia") for lack of jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601 *et seq*., even though Liberia directed the National Port Authority of Liberia ("NPA of Liberia"), its wholly-owned instrumentality, to cancel the contract between GSS and the NPA of Liberia—thereby giving rise to the arbitral awards granting GSS breach-of-contract damages?

2.     Did the district court err in dismissing the amended petition against the *NPA of Liberia* when jurisdiction over Liberia will, without more, afford jurisdiction over the NPA of Liberia?

1

### STATEMENT OF THE CASE

A.     *Nature of the Case*.  This case concerns petitioner GSS's amended

petition[1] to confirm against both the Republic of Liberia ("Liberia") and its wholly-

owned instrumentality, the NPA of Liberia, two arbitral awards—one on liability

and one on damages—issued in London against the NPA of Liberia by Lord

Mustill, a renowned English arbitrator and former Law Lord.[2]   Those arbitral

awards are grounded in the NPA of Liberia's wrongful cancellation in January

2006 of the Project Agreement between GSS and the NPA of Liberia for the

rebuilding and expansion of port facilities in Monrovia, Liberia's largest port.[3]

The events commencing with the negotiation of the Project Agreement and

culminating in the arbitral awards are set out in the district court's opinion[4] and

summarized below.

This is the second occasion on which this case is before this Court.  GSS ini-

tially petitioned the district court to confirm the arbitral awards against only the

---

[1]     GSS's amended petition against Liberia and the NPA of Liberia is A.6-15, with Exhibits 1 to 8, A.16-93.

[2]     The liability award is Exhibit 7 to the amended petition, found at A.75.  The damages award is Exhibit 8 to the amended petition, at A.82.

[3]     The contract is the "BOT Project Agreement dated 22 August 2005 ("Project Agreement"), Exhibit 2 to the amended petition, at A.34.

[4]     *See* Addendum at 2-5 and *GSS Group Ltd. v. Nat'l Port Auth.*, 2014 WL 930790, at **1-2 (D.D.C. Mar. 11, 2014).

NPA of Liberia, in accordance with the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), codified as Section 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq*.[5]  On March 11, 2011, the district court dismissed that petition for lack of personal jurisdiction owing to the NPA of Liberia's lack of sufficient due process contacts with the forum.[6]  On May 25, 2012, this Court affirmed that dismissal.[7]  Meanwhile, GSS, on March 21, 2012, had filed an amended petition to enforce the arbitral awards against both Liberia and the NPA of Liberia in accordance with the New York Convention.   Unlike agencies or instrumentalities, a State like Liberia does not have constitutional due process rights.[8]  GSS's amended petition is the subject of this appeal.

> 1.    *The Claim Against Liberia.*

In *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983) ("*Bancec*"), the Supreme Court recognized two grounds for which a State such as Liberia can be held responsible for the acts of a wholly-owned instrumentality such as the NPA of Liberia.  The first ground is when the

---

[5]    *See* amended petition, A.6-93.

[6]    *See GSS Group Ltd. v. Nat'l Port Auth.*, 774 F. Supp. 2d 134 (D.D.C. 2011).

[7]    *GSS Group Ltd. v. Nat'l Port Auth.*, 680 F.3d 805 (D.C. Cir. 2012).

[8]    *GSS*, 680 F.3d at 813, citing *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).

State so extensively controls the instrumentality that "a relationship of principal and agent is created."[9]  The second ground is the "broader equitable principle" that juridical separateness will be disregarded to prevent "fraud or injustice."[10]

GSS's amended petition states valid claims against Liberia on both grounds. It is based on:

 (a) Liberia's extensive control over the NPA of Liberia, rendering Liberia the principal and the NPA of Liberia the agent—demonstrated by the fact (among other things) that Liberia purposefully directed the NPA of Liberia to cancel the Project Agreement between GSS and the NPA of Liberia,[11] thereby giving rise to the breach-of-contract damages set out in the arbitral awards; and

(b) the injustice that would result were Liberia to escape responsibility for having itself directed the NPA of Liberia to cancel and thereby breach the Project Agreement.

The district court erred by concluding that the two *Bancec* grounds for State liability did not apply.

---

[9]      *Bancec*, 462 U.S. at 629.

[10]     *Id.* at 629.

[11]     *See* the December 30, 2005 letter of Mr. C. Gyude Bryant, the head of the National Transitional Government of Liberia, A.975-977 (977 a clean version of 975-976), discussed further *infra*.

4

2.    *The Claim Against the NPA of Liberia.*

Liberia's amenability to GSS's action affords jurisdiction *ipso facto* over the NPA of Liberia.  As this Court has observed, "[w]henever a foreign sovereign so controls an instrumentality to such an extent that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign:  none."  *GSS*, 680 F.3d at 815, citing *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 302 (D.D.C. 2005).  The same is true if recognizing separateness between the State and its instrumentality would result in manifest injustice under the second equity-based *Bancec* ground for State liability.  Accordingly, if GSS can enforce the awards against Liberia, it can do so against the NPA of Liberia.

B.    *Course of Proceedings*.  GSS alleges in the amended petition that Liberia exercised plenary control over the NPA of Liberia,[12] that their economic interests are the same,[13] and that Liberia had instructed the NPA of Liberia to cancel the Project Agreement.[14]  Liberia's directive that the NPA of Liberia cancel the Project Agreement with GSS is telling because it demonstrates the control that renders Liberia the principal of the NPA of Liberia for purposes of the cancellation

---

[12]     A.10-11, ¶¶ 17-22.

[13]     A.11-12, ¶¶ 23-27.

[14]     A.12-13, ¶¶ 28-33.

of the Project Agreement and also the equity-based wrong that requires Liberia and the NPA of Liberia to be treated as one for purposes of GSS's amended petition. In sum, Liberia's directive that the NPA of Liberia cancel and thereby breach the Project Agreement satisfies both grounds for State liability recognized in *Bancec*.

On July 12, 2012, Liberia and the NPA of Liberia moved to dismiss the amended petition under Rule 12(b).[15]  On November 2, 2012, GSS opposed the motion on the grounds, among others, that Liberia's directive that the NPA of Liberia cancel the Project Agreement satisfied both *Bancec* grounds for State liability.   To dispel any doubt concerning the relationship between Liberia and the NPA of Liberia, GSS served with its opposition papers a Request for Production of Documents[16] and Rule 30(b)(6) deposition notices directed to Liberia and the NPA of Liberia.[17]   The expectation was that Liberia and the NPA of Liberia would respond in due course to GSS's discovery requests following the district court's ruling on the motion to dismiss, were further evidence concerning the relationship between the two necessary.  Liberia and the NPA of Liberia have not responded to those discovery requests because the district court has dismissed the amended petition outright.

---

[15]      A.93.

[16]      A.1318-1324.

[17]      A.1325-1328; 1329-1332.

6

C.    *The Decision Below.*  On March 11, 2014, the district court, without

hearing argument, issued its "Opinion" granting respondents' Rule 12(b) motion

and dismissing GSS's amended petition.[18]

1.    *The Claim Against Liberia.*

The district court recognized that *Bancec* sets out two grounds for over-

coming the presumption that Liberia and the NPA of Liberia have independent

status.[19] The district court also noted that it had "considerable latitude in devising

the procedures it [would] follow to ferret out the facts pertinent to jurisdiction."[20]

But the district court then proceeded to rule on the basis of the parties' submis-

sions, without regard to GSS's discovery requests,[21] the responses to which

awaited the district court's ruling.

(a)    *Liberia's control over the NPA of Liberia*

The district court first addressed the indicia of Liberia's control over the

NPA of Liberia, guided by this Court's decision in *Transamerica Leasing, Inc. v.*

*La Republica de Venezuela*, 200 F.3d 843 (D.D.C. 2000), concluding that the

evidence did not "demonstrate the sort of extensive control necessary to disregard

---

[18]    Addendum at 27, and *GSS*, 2014 WL 930790.

[19]    Addendum at 15, *GSS*, 2014 WL 930790 at *6-7.

[20]    Addendum at 17, *GSS*, 2014 WL 930790 at *8, quoting *Foremost-McKesson*
*v. Islamic Rep. of Iran*, 905 F.2d 438, 449 (D.D.C. 1990).

[21]    Addendum at 18, *GSS*, 2014 WL 930790 at *8.

the NPA's distinct corporate identity."[22]  The district court then turned to the fact, emphasized by GSS, that the NPA had cancelled the Project Agreement at the direction of the head of Liberia's government.[23]  It concluded that GSS had not shown "how this *one instance of control* satisfies the standard set out in *Bancec*, a standard which" according to the district court "demands a showing of 'extensive control' to overcome the presumption that the NPA's independent status should be respected."[24]  In the district court's analysis, GSS was required to show "complete domination" on a regular basis, such as "might entail, for example, the government's management of day-to-day 'routine business decisions.'"[25]

This is the crux of the error in the district court's ruling:  the erroneous view that the "one instance of control" evident in Liberia's directive that the NPA of Liberia cancel the Project Agreement—the specific subject of the principal-agent relationship at issue—is insufficient, without more, to satisfy the standard set out in *Bancec*.  The facts here satisfy the criteria for the principal-agency relationship

---

[22]    Addendum at 23, *GSS*, 2014 WL 930790 at *10.

[23]    Addendum at 23-24, *GSS*, 2014 WL 930790 at *10, referring to Mr. Bryant's December 30, 2005 letter, A.977.

[24]    Addendum at 24, *GSS*, 2014 WL 930790 at *10 (emphasis added).

[25]    Addendum at 24, *GSS*, 2014 WL 930790 at *11, quoting *Transamerica*, 200 F.3d at 853.

broadly set out in *Transamerica*[26]—and the issue is put beyond doubt by Liberia's directive that the NPA of Liberia cancel the Project Agreement. Furthermore, the relevant control exercised by Liberia does not concern the initial execution of the Project Agreement, as the district court mistakenly suggests,[27] but rather the later cancellation of that contract. In short, when Liberia directed the NPA of Liberia to cancel the Project Agreement, Liberia acted as principal, the NPA of Liberia was its agent, and that principal-agent relationship—manifest in the cancellation of the Project Agreement—satisfies the *Bancec* standard.[28]

The district court also concluded that "the letter sent to the NPA by the Chairman of Liberia's transitional government, directing that the contract be cancelled, appears more likely to be an instance of a sovereign acting as a government regulator than as corporate parent."[29] But that *Transamerica*-based analogy does not fit the facts. In *Transamerica* the claimant sought to show Venezuela's involvement in its instrumentality's "day-to-day" business.[30] Here, the issue is the

---

[26]     *Transamerica*, 200 F.3d at 849.

[27]     Addendum at 24-25, *GSS*, 2014 WL 930790 at *11.

[28]     *Bancec*, 462 U.S. at 629 ("Thus, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other.")

[29]     Addendum at 25, *GSS*, 2014 WL 930790 at *11, citing *Transamerica*, 200 F.3d at 851, referring to Mr. Bryant's December 30, 2005 letter, A.977.

[30]     *Transamerica*, 200 F.3d at 851.

9

control over the NPA of Liberia reflected in Liberia's directive that the NPA of Liberia cancel the Project Agreement, in order for a new contract to be put out to bid, with different operational and financial terms preferred by Liberia. What is more, the principal Liberian regulator, the Contract & Monopolies Commission ("CMC), had approved the Project Agreement before Liberia cancelled it,[31] indicating that Liberia was not acting in any regulatory capacity when it did so.

> (b)    *Equity to Prevent Injustice.*

The district court was also dismissive of GSS's equity-based claim grounded in the alternate *Bancec* standard,[32] concluding that GSS had not shown the sort of injustice like that in *Bancec* (the sovereign seeking to shield itself from counterclaims) and *Transamerica* (the sovereign unjustly enriching itself through the state-owned enterprise).[33] The district court's analysis however is too narrow. The particular circumstances of any case involving sovereign and subsidiary instrumentalities determine whether equity dictates piercing the corporate veil to render the sovereign responsible for the acts of its instrumentality. In accordance

---

[31]    *See* A.350, ¶ 39, and A.929-934, the CMC's October 27, 2005 letter to Mr. Bryant.

[32]    *Bancec*, 462 U.S. at 629 (" In addition, our cases have long recognized the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.") (internal quotations omitted).

[33]    Addendum at 26, *GSS*, 2014 WL 930790 at *11.

with the federal-common-law veil-piercing rule, applicable in the FSIA context,

"[t]he corporate veil may be pierced to hold an alter ego liable for the commit-

ments of its instrumentality only if (1) the owner exercised complete control over

the corporation *with respect to the transaction at issue* and (2) such control was

used to commit a fraud or *wrong* that injured the party seeking to pierce the veil."

*Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 359 (5th Cir.

2003) (emphasis added).  That rule recognizes that control "with respect to the

transaction at issue" *can* be sufficient when that exercise of control wrongfully

injures the claimant.  Here the requisite  "wrong" is the repudiatory breach of the

Project Agreement and the injury is the damages set out in the arbitral awards.

### 2.     *The Claim Against the NPA of Liberia*

The district court also ruled that owing to the earlier motion practice culmi-

nating in the dismissal of GSS's initial petition against the NPA of Liberia, the

doctrine of issue preclusion prevented GSS from now raising the NPA of Liberia's

status as Liberia's agent.[34]  If Liberia however is subject to jurisdiction in the

manner foreshadowed in *Bancec* then the NPA of Liberia cannot raise constitu-

tional due process defenses to the amended petition.[35]

---

[34]     Addendum at 13-14, *GSS*, 2014 WL 930790 at **4-6.

[35]     *See GSS*, 680 F.3d at 814-815.

11

STATEMENT OF THE FACTS

A.     **The Arbitration Proceedings**

The declaration of David McKie, GSS's solicitor, provides the chronology of the arbitration proceedings between GSS as claimant and the NPA of Liberia as respondent that commenced on June 22, 2006 with GSS's appointment of Lord Mustill and culminated on May 7, 2009 with the final damages award.[36]  GSS's amended petition in the district court and the attached exhibits likewise chart Lord Mustill's decisions leading to the damages award, including preliminary awards on jurisdiction and liability.  While neither the NPA of Liberia nor Liberia formally participated in the London arbitration, Lord Mustill took pains to ensure that the NPA of Liberia had notice of all actions taken in those proceedings, and Liberian counsel for the NPA of Liberia communicated with Lord Mustill concerning the proceedings.[37]

For example, although Lord Mustill, after issuing his jurisdictional ruling, could have proceeded forthwith to decide the merits, he did not do so.  On March

---

[36]     A.661-689 (without exhibits).

[37]     *See*, *e.g.*, the letters that the NPA of Liberia's Liberian counsel, Mr. James E. Pierre of Pierre, Tweh & Associates, sent to Lord Mustill, described in and exhibited to the declaration submitted by GSS's solicitor Mr. McKie in earlier proceedings in the district court.  A.663, ¶ 6, to A.668, ¶ 15.

6, 2008, he issued a "Further Ruling",[38] stating that as he had ruled that he had jurisdiction, he "must consider how to deal with the possibilities, put in play by NPA in various ways, that the [Contract] is vitiated by misrepresentation, bribery, and illegality".[39] "The case is," Lord Mustill noted, "out of the ordinary."  "The sum claimed is some tens of millions of US Dollars, and the Issues raised by NPA, for which there is written evidence in support, although by no means unfamiliar at the present time require to be handled with special care."[40]  As a result, the "NPA [of Liberia] should be given one more opportunity to place its defence formally on the record," Lord Mustill decided, "and to support it formally with such evidence as it thinks fit."  "If NPA takes this course," he added, "I will invite submissions on how the matter can most economically and speedily be progressed."[41]  Accordingly, Lord Mustill gave the NPA of Liberia until March 28, 2008 to submit its defence.[42]

The NPA of Liberia did not do so however, leading Lord Mustill on June 20, 2008 to issue the liability award.[43]  In the "Reasons" for that award, Lord Mustill

---

[38]     A.73-74.

[39]     A.73, ¶ 1.

[40]     *Id.*, ¶ 2.

[41]     *Id.*, ¶ 3.

[42]     *Id.*, ¶ 4.

[43]     A.75-78.

13

addressed and dismissed the NPA of Liberia's allegation that the Contract was illegal on the basis (as the NPA of Liberia had claimed) that it had been procured by GSS's bribery of government officials, as being unproven based on the limited evidence submitted by the NPA of Liberia.[44]

Lord Mustill was equally deliberate in addressing GSS's damages.  On June 26, 2008, he issued a "Procedural Order" along with the liability award.[45]  "The situation is most unusual," Lord Mustill noted, "for the sum claimed is very large, even by modern standards," and the evidence at that time was not substantial.[46] Noting certain shortcomings in GSS's submissions, Lord Mustill pointedly added that he had not "overlooked the fact that the Chairman of the Provisional Government [i.e., Chairman Bryant] himself complained that the Agreement was unfairly favourable to the Claimant." "But an attempt on my part to put a figure at the present stage to the Claimant's loss would be no more than guesswork, and the sum involved is so large that this would not be an acceptable process."[47]  "In these circumstances," Lord Mustill said, "I invite the Claimant to reconsider the quanti-

---

[44]    *See* A.669, ¶ 18, referring to the two affidavits submitted by the NPA of Liberia alleging corruption on the part of GSS, cited by Lord Mustill in his liability award, A.77, ¶¶ 4-6.

[45]    A.79-81.

[46]    *Id.*, ¶ 2.

[47]    *Id.*, ¶ 4.

fication of its claim, and to provide me with a realistic way of evolving a figure, using data and methods which I have means of testing."[48]  He thus directed GSS to submit a "Memorial setting forth the nature of its case on the evaluation of damages."[49]

On November 28, 2008, GSS submitted its memorial on damages, including two expert accounting reports.[50]  And on January 28, 2009, before considering the damages claimed by GSS, Lord Mustill, consistent with the "special care" guiding his conduct of the arbitration, gave the NPA until February 20, 2009 to present its defenses to GSS's claim.[51]  As Lord Mustill said, "[i]n the past, this Tribunal has gone to every length [to] conform with the principle audi alterem partem by ensuring that the Respondent has had the fullest opportunity to answer the case made against it,"[52] and the further 30-day response window did so again.  The NPA again did not respond.  On May 7, 2009, Lord Mustill therefore issued the damages award, in the sum of $44,347,260,[53] following the fullest notice to the NPA.  The

---

[48]     *Id.*, ¶ 5.

[49]     A.80-81.

[50]     A.669 (¶19).

[51]     A.669-670, ¶ 19.

[52]     *Id.*

[53]     A.82-93.

NPA of Liberia thereafter took no steps in the English courts to challenge Lord Mustill's interim and final awards.

B.    **Liberia's General Control Over the NPA of Liberia**

The record contains substantial evidence demonstrating Liberia's general organizational control over the wholly state-owned NPA of Liberia. That organizational control explains Liberia's ability as principal to order the NPA of Liberia to cancel the Project Agreement and inflict GSS's breach-of-contract damages.

Among other things, Liberia's President dominates and controls the NPA of Liberia's 15-member board of directors. As stated in Chapter VI of the Liberian Public Authorities Law a/k/a the National Port Authority Act ("NPAA"), the NPA of Liberia's board consists of 15 persons, all subject to the President's control.[54] Three board members are government ministers who, in accordance with Articles 54(a) and 56(a) of the Liberian Constitution, are appointed by the President and hold their offices at the pleasure of the President (NPAA § 55(2)(a)). Another director is the managing director appointed by the President-controlled board (NPAA § 55(2)(b) and § 56). Seven directors are members at large appointed by the President (*id.* § 55(2)(c)). The final four directors are representatives of the users of the Liberian ports who also serve subject to the approval and appointment of the President (*id.* § 55(2)(d)). And the President appoints the board chairman

who casts the deciding vote in the case of a tie (*id.* § 55(2)). The control over the board of directors exercised by Liberia's President is therefore extensive.

A Concession Agreement between the NPA of Liberia and a third party that is analogous to the Project Agreement between the NPA and GSS further demonstrates Liberia's plenary control over the NPA of Liberia.[55] That Agreement is the product of the Liberian Government's "Port Sector Reform Program" (Whereas ¶ B) and the efforts of the "Inter-ministerial Committee for the Freeport of Monrovia Concession" (*id.* ¶ D). The Notice terms provide for notices to be sent to the NPA of Liberia, the Minister of Finance, the Chairman of the National Investment Commission, and the Minister of Justice.[56] The Concession Agreement is executed on behalf of the NPA of Liberia by the Chairman of the its board of directors, its managing director, the Minister of Finance, the Chairman of the National Investment Commission, the Minister of Justice, and H.E. Ellen Johnson-Sirleaf, Liberia's President.[57] That also shows that the Liberian Government controls all

---

[54]     A.566, 573-574.

[55]     A.1154. The Concession agreement dated August 17, 2010 is between the NPA and APM Terminals Ltd. ("APM"). It is similar in purpose to the Project Agreement between GSS and the NPA in that APM undertakes to develop the ports in Liberia. (GSS does not have the full executed Concession Agreement, only those pages included with the Declaration of David Wenger (A.1150) opposing Liberia's and the NPA's motion to dismiss.)

[56]     A.1182-1183.

[57]     A.1187-1188.

important decisions on the part of the NPA of Liberia, a public authority, including decisions on matters such as the Concession Agreement that, like the Project Agreement, are critically important to Liberia's national economy.

In addition, the NPA of Liberia's Annual Report for 2008 explains that the Government of Liberia, through the Ministry of Finance, had absorbed the then-existing debt burden of the NPA of Liberia, amounting to $32.2 million.[58]  That Liberia in 2007-2008 absorbed the NPA of Liberia's entire debt burden—a significant factor under traditional veil-piercing analysis—shows that Liberia, generally speaking, is not truly separate from the NPA of Liberia, either for principal-agent or veil-piercing purposes.  There would likely be more evidence of Liberia's control were Liberia and the NPA of Liberia to respond to GSS's discovery requests.

C.     **Liberia's Cancellation of the Project Agreement.**

Liberia's extensive control over the NPA of Liberia is not merely structural or institutional.  It accounts for the cancellation of the Project Agreement, the arbitral awards, and the breach-of-contract damages owed to GSS.  The district court's opinion[59] generally sets forth the events leading to the December 30, 2005 letter sent by C. Gyude Bryant, the head of the National Transition Government of

---

[58]     A.1202 (*see* section 3.1).

[59]     Addendum at 3-4, *GSS*, 2014 WL 930790 at *2.

Liberia ("NTGL"), directing the chairperson of the NPA of Liberia's board of directors to cancel the Project Agreement and put a replacement contract out for rebidding.[60]

The course of events is spelled out in greater detail in the Statement of Claim that GSS's London solicitor, David McKie, presented to Lord Mustill at the outset of the arbitration proceedings.[61]  In that Statement of Claim GSS explained that the initial Project Agreement (June 2005) was renegotiated and amended (August 2005) to ensure that it would meet the approval of Liberia's Contract and Monopolies Commission.[62]  On August 29, 2005, the CMC confirmed the Project Agreement complied with Liberian law.[63]  As a result the Project Agreement met regulatory requirements—and Liberia was not later acting as a regulator when Mr. Bryant directed the NPA of Liberia to cancel it.

GSS amended the Project Agreement again in November 2005 after the International Contact Group of Liberia ("ICGL") asked Mr. Bryant of the NTGL to

---

[60]     A.975-977 (977 is a clean copy of 975-976), discussed further and quoted verbatim below.

[61]     A.340-358.  The exhibits to the Statement of Claim consisted of 326 pages of attachments.  Most of those pages are appended to a later Declaration that Mr. McKie submitted in the district court explaining among other things the chronology of the arbitration proceedings.  *See* A.661, ¶ 6, to A.670, ¶ 21.

[62]     A.343, ¶ 17, to A.346, ¶ 35.

[63]     A.345-346, ¶¶ 30-31.

review it.[64]  The Project Agreement was accordingly a valid contract enforceable in

accordance with English law and the London arbitration agreement in it.[65]  Mr.

Bryant had no right to direct the NPA of Liberia to cancel it.[66]

Furthermore, the reasons given by Mr. Bryant were largely commercial.  "I

have taken off considerable time to carefully review the analysis of my technical

team regarding equitable benefits to all parties resulting from the contract entered

into between the NPA and the GSS, " Mr. Bryant said at the start of his December

30, 2005 letter, and "[o]ur evaluation shows that the contract as negotiated and

concluded places the Port Authority in a grossly disadvantageous position for more

than a decade."[67]  As a result, Mr. Bryant said:

> *I am therefore directing that the GSS contract be*
> *cancelled and the Port Authority works toward a more*
> *holistic management contract that will improve opera-*
> *tional, financial and security efficiency levels.*  The
> sourcing of any managing team must be done through a
> competitive bidding process after proper terms of
> reference are agreed upon and approved by the Contract
> & Monopolies Commission and the technical committee

---

[64]    A.349-350, ¶¶ 36-41.

[65]    A.22-23, ¶ 8.1.

[66]    *See* GSS's Statement of Claim, A.354, ¶ 63 to A.355,  ¶ 68 (Respondent's
Breach of Contract), and Lord Mustill's liability award, A.75-78.

[67]    A.977.

of the EGSC.  The GSS shall be free to submit an offer at
that time.[68]

Liberia, acting at that time through Mr. Bryant, was not merely cancelling the

Project Agreement.  It was wresting control of the port-enhancement contract from

the NPA of Liberia, dictating operational and financial standards, and mandating

the bidding process under which another replacement contract would be concluded,

with terms approved by the CMC (which had reviewed and approved the Project

Agreement) and another government bureau, the Economic Governance Steering

Committee ("EGSC").  In these circumstances Liberia was the principal and the

NPA of Liberia its agent when Mr. Bryant directed the NPA of Liberia to cancel

the Project Agreement and when the NPA of Liberia did so.

On January 3, 2006, the NPA of Liberia's chairperson protested Mr.

Bryant's December 30, 2005 directive in a lengthy letter, explaining among other

things that the NPA of Liberia had entered into the Project Agreement with GSS in

the manner approved by the CMC.[69]  But that January 3, 2006 letter had no effect.

That it had no effect proves that Liberia alone orchestrated the cancellation of the

Project Agreement based on Liberia's objections to its operational and financial

terms.  On January 26, 2006, the NPA of Liberia, now under the control of

---

[68]     A.977.

[69]     A.982-984.

21

Liberia's newly-elected government, informed GSS that it was cancelling the

Project Agreement, parroting the reasons stated in Mr. Bryant's December 30,

2005 directive.[70]  On February 18, 2006, the NPA of Liberia sent GSS a further

letter following up on its earlier January 26, 2006 letter, declaring the Project

Agreement null and void,[71] as noted by the district court.[72]  That precipitated the

March 15, 2006 arbitration demand[73] that led to the liability and damages awards.

Following that January 26, 2006 letter, the NPA of Liberia ordered GSS to cease

work and vacate the site.  Doing so rendered the NPA of Liberia in repudiatory

breach of the Project Agreement, as Lord Mustill ruled in the liability award.[74]

And it was the directive that the NPA of Liberia cancel the Project Agreement and

vacate the site that caused the NPA of Liberia to be in repudiatory breach.  In these

circumstances Liberia is bound by the arbitral awards to the same extent as the

NPA of Liberia.

---

[70]     A.985, addendum at 4, *GSS*, 2014 WL 930790 at *2.  *See* GSS's Statement
of Claim, A.351, ¶ 46 to A.354,  ¶ 62 (Purported Cancellation of the August
Agreement), in particular A.352-353, ¶¶ 53-55.

[71]     A.997-999.

[72]     Addendum at 4-5, *GSS*, 2014 WL 930790 at *2.

[73]     A.357, ¶ 78.

[74]     A.75-78.

### SUMMARY OF THE ARGUMENT

A.    *The Claim Against Liberia.*  Liberia is subject to FSIA jurisdiction and is bound by the arbitral awards alongside the NPA of Liberia, on the two grounds recognized in *Bancec*.

1.    Liberia's directive that the NPA of Liberia cancel the Project Agreement demonstrates Liberia's extensive control over the NPA of Liberia insofar as the cancellation of the Project Agreement is concerned and renders Liberia the principal and the NPA of Liberia its agent for purposes of the cancellation of the Project Agreement.

2.    In addition and alternatively, Liberia's directive that the NPA of Liberia cancel the Project Agreement satisfies the federal-common-law veil-piercing standard:  Liberia exercised complete control over the NPA of Liberia with respect to the particular transaction at issue—the cancellation of the Project Agreement—and that control was used to commit the wrong evident in the repudiatory breach of the Project Agreement.

B.    *The Claim Against the NPA of Liberia.*  If GSS has a valid claim against Liberia then the NPA of Liberia has no constitutional due process defense.

C.    *Discovery*.  If there is nonetheless any doubt concerning the scope of Liberia's directive that the NPA of Liberia cancel the Project Agreement, then the

23

Court should remand the action with directions that the district court consider respondents' eventual responses to GSS's discovery requests.

<h3 style="text-align:center">STANDARD OF REVIEW</h3>

The district court's rulings that it lacked subject matter jurisdiction over Liberia and personal jurisdiction over the NPA of Liberia constitute conclusions of law reviewable *de novo*.   The district court's failure to consider GSS's discovery requests is reviewable for abuse of discretion.

<h3 style="text-align:center">ARGUMENT</h3>

<h3 style="text-align:center">I.<br>The Amended Petition States A Valid Claim<br>Against The Republic of Liberia</h3>

Liberia's directive that the NPA of Liberia cancel the Project Agreement satisfies both grounds for State liability recognized in *Bancec*:  the common-law principal-agent standard and the equity-based wrong or injustice standard.

A.    *Liberia is the Principal*.

The district court viewed the principal-agent standard to require "complete domination," stating that "[c]omplete domination results where a sovereign's control over an instrumentality 'significantly exceeds the normal supervising control exercised by any corporate parent over its subsidiary,'" quoting *Transa-*

24

*merica*.[75]  In *Transamerica*, however, this Court was addressing the relevance of

control generally,[76] without imposing a "complete domination standard."  As this

Court explained in *Transamerica*, "[c]ourts have long struggled, often with

confusing results, to explain how much control is required before parent and

subsidiary may be deemed principal and agent."[77]  "At a minimum," the Court

could "confidently state":

> The relationship of principal and agent does not obtain
> unless the parent has manifested its desire for the
> subsidiary to act upon the parent's behalf, the subsidiary
> has consented so to act, the parent has the right to
> exercise control over the subsidiary with respect to
> matters entrusted to the subsidiary, and the parent
> exercises its control *in a manner more directly than by
> voting a majority of the stock in the subsidiary or making
> appointments to the subsidiary's Board of Directors*.

*Transamerica*, 200 F.3d at 849 (emphasis added), citing RESTATEMENT (SECOND)

OF AGENCY § 1.   Those criteria fit the facts here.  Liberia told the NPA of Liberia

what to do, the NPA of Liberia did so, Liberia plainly had the right to control the

NPA of Liberia, and Liberia exercised its control "in a manner more directly than

by voting a majority of the stock in the subsidiary or making appointments to the

subsidiary's Board of Directors."

---

[75]    Addendum at 15, *GSS*, 2014 WL 930790 at *11, quoting *Transamerica*, 200
F.3d at 848.

[76]    *Transamerica*, 200 F.3d at 848.

The district court did not apply that four-factor *Transamerica* test correctly. It concluded, erroneously, that as to the third factor identified in *Transamerica*, on which GSS's position purportedly "hinged," that "the matter entrusted" to the NPA of Liberia was the initial "execution" of the Project Agreement,[78] when the matter in question is the later cancellation of that Agreement, which Liberia did not entrust to the NPA of Liberia. According to the district court, GSS had "offer[ed] no reasoning or authority to elucidate why this one instance of control should suffice to give rise to an agency relationship between Liberia and the NPA,"[79] but GSS's reasoning is grounded in Liberia's disregard—insofar as the cancellation of the Project Agreement is concerned—of the corporate formalities that would otherwise have kept Liberia and the NPA of Liberia as separate entities. Thus, as to the fourth *Transamerica* factor, Liberia did not act through the government-appointed members of the NPA of Liberia's board of directors, as it might have done. It preempted a board decision by unilaterally directing the NPA of Liberia to cancel the Project Agreement. And the district court, as noted, mistakenly applied a "complete domination" standard, which in the district court's mind would require GSS to show, for example, "the government's management of day-to-day 'routine

---

[77]     *Id.* at 849.

[78]     Addendum at 24-25, *GSS*, 2014 WL 930790 at *11.

[79]     Addendum at 25, *GSS*, 2014 WL 930790 at *11.

business decisions,'" thereby rendering "the single example of control at issue here" irrelevant.[80]

The district court also considered that GSS had "fail[ed] to explain how the first two elements of the principal-agent standard have been met on these facts" when "there is no indication that '[Liberia] manifested its desire for the [NPA] to act upon its behalf' in engaging a new port manager, nor that the NPA 'consented so to act.'"[81] But that ignores what actually happened. By directing the NPA of Liberia to cancel the Project Agreement, Liberia manifested a desire that the NPA of Liberia act on its behalf. And the NPA of Liberia "consented so to act" because it followed Liberia's directive.

In addition, *Transamerica* recognizes the difference between a State parent's general control over its instrumentality and the specific control reflected in the harm in question. While this Court in *Transamerica* dismissed the first three counts of the complaint that alleged Venezuela's general control over its instrumentality, CAVN, it remanded the action so that the district court could rule on the final count of the complaint that it had not considered, *i.e.*, whether Venezuela was subject to the plaintiffs' claims that Venezuela had "caused CAVN to breach its

---

[80]    Addendum at 24, *GSS*, 2014 WL 930790 at *11, quoting *Transamerica*, 200 F.3d at 853.

contracts with them by * * * refusing to allow CAVN to perform its obligations under the Equipment Lease Agreements and the restructuring and repayment plans."[82]  In *Transamerica* this Court was right to require the district court to adjudicate that stand-alone breach-of-contract count.  *See S & Davis Int'l Inc. v. The Repub. of Yemen*, 218 F.3d 1292, 1299-1300 (11th Cir. 2000) ("By issuing direct orders to terminate the contract, the sovereign becomes more of a managing partner over its 'agency or instrumentality.'") (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695-696 (1976) (holding that "the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities."))  The question here is the same:  Did Liberia cause the NPA of Liberia to breach the Project Agreement.  If it did so—and the facts show it did so—then Liberia is the *de facto* principal and GSS can enforce the arbitral awards against it.

B.     *Liberia Did Not Act as Regulator*.

The district court was also mistaken to suggest that Liberia's directive that the NPA of Liberia cancel the Project Agreement "appears more likely to be an

---

[81]     Addendum at 25, *GSS*, 2014 WL 930790 at *11, quoting *Transamerica*, 200 F.3d at 849.

[82]     *Transamerica*, 200 F.3d at 854.

instance of the sovereign acting as government regulator rather than as corporate parent,"[83] citing *Transamerica*, 200 F.3d at 851.  The analogy to the facts in *Transamerica* is incorrect.

In *Transamerica* this Court was addressing the district court's finding that "Venezuela was involved in CAVN's day-to-day operations because 'the Economic Department for the Sector, an agent of Venezuela, authorized the sale of [three] of CAVN's vessels.'"[84]  This Court noted that that finding did not support the proposition that Venezuela exercised the requisite control over CAVN for two reasons.  "First, the sale of a portion of its fleet as part of a massive restructuring" did not qualify "as CAVN's day-to-day business."  "Second," the Court added, "it is not uncommon for a government—as regulator, not as shareholder—to require approval for certain transactions in the transportation sector."[85]  Here, in contrast, we are dealing with a Project Agreement duly negotiated and agreed between GSS and the NPA of Liberia, *approved by the CMC*, yet summarily cancelled over the objections of the former management of the NPA of Liberia, owing ostensibly to Liberia's after-the-fact preference for different commercial terms and a different

---

[83]     Addendum at 25, *GSS*, 2014 WL 930790 at *11.

[84]     *Transamerica*, 200 F.3d at 393.

[85]     *Id.* at 393.

bidding process.[86]  But Liberia could not trample on GSS's legal rights and "regu-

latory" acts cannot excuse wilful breach of the Project Agreement.  If Liberia

believed that its and the NPA of Liberia's actions did not breach the Project

Agreement then it was incumbent on Liberia to appear in the arbitration (or direct

the NPA of Liberia to do so) and oppose GSS's breach-of-contract claim.  But

Liberia elected not to do so and the only defenses available to Liberia now, if any,

are those defenses to enforcement of the awards allowed by Article V of the New

York Convention.[87]

>    C.      *Equity Renders Liberia Bound by the Arbitral Awards*.

In addition, and alternatively, Liberia is subject to GSS's amended petition

owing to the second ground in *Bancec*— "the broader equitable principle that the

doctrine of corporate entity, recognized generally and for most purposes, will not

be regarded when to do so would work fraud or injustice."  *Bancec*, 462 U.S. at

629.  As noted,[88] that equitable principle embraces the federal-common-law veil-

piercing rule that "[t]he corporate veil may be pierced to hold an alter ego liable for

the commitments of its instrumentality only if (1) the owner exercised complete

---

[86]      A.975-977 (Mr. Bryant's December 30, 2005 letter) and A.273 (the NPA of
Liberia's January 26, 2006 letter).

[87]      Respondents raised certain Article V defenses in its motion to dismiss the
amended complaint, A.95-96, (5), but the district court did not reach those
defenses.

control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or *wrong* that injured the party seeking to pierce the veil." *Bridas*, 345 F.3d at 359. Here Liberia exercised complete control over the NPA of Liberia "with respect to the transaction at issue," *i.e.*, the cancellation of the Project Agreement. And the wrong is the repudiatory breach of the Project Agreement.

The district court sought to pigeon-hole this alternative equity ground to the facts in *Bancec* and *Transamerica*, concluding that "it is not at all apparent that any of these conditions is present on the facts of this case."[89] But as also noted,[90] the specific grounds for State liability in *Bancec* (sovereign seeking to shield itself from counterclaims) and *Transamerica* (sovereign unjustly enriching itself through the state-owned enterprise or using a state-owned corporation to defeat a statutory policy) do not circumscribe the equitable principle recognized in *Bancec.* Equity will step in whenever the factual grounds warrant piercing the corporate veil and holding parent and subsidiary liable as one.

The district court failed to apply the equity standard by failing to consider whether the facts satisfied the two-prong test: (a) did Liberia exercise complete

---

[88]    *See* above at 10-11.

[89]    Addendum at 26, *GSS*, 2014 WL 930790 at *11.

[90]    *See* above at 10.

31

control over the NPA of Liberia insofar as the cancellation of the Project

Agreement (the transaction at issue) is concerned, and (b) was the breach of the

Project Agreement a remediable wrong.   As the answer to each question is yes, the

district court erred in dismissing the amended petition.

**II.**
**The Amended Petition States A Valid**
**Claim Against the NPA of Liberia**

This Court has previously concluded that "[w]henever a foreign sovereign so

controls an instrumentality to such an extent that a principal-agent relationship

arises between them, the instrumentality receives the same due process protection

as the sovereign:  none." *GSS*, 680 F.3d at 815, citing *TMR Energy*, 411 F.3d at

302.   The same principle would apply if equity were the reason for disregarding

the corporate separateness between a sovereign parent and its subsidiary instru-

mentality.  Accordingly, if Liberia is subject to the amended petition, the NPA of

Liberia has no constitutional due process defense.

The district court nonetheless ruled that issue preclusion prevents GSS from

raising in the amended petition the liability of the NPA of Liberia which GSS had

pleaded in the initial petition that was dismissed on due process grounds.[91]  The

issue-preclusion doctrine does not however sweep so broadly.  The goal of issue

preclusion "to prevent repetitious litigation of what is essentially the same

32

dispute"[92] is not implicated when the amended petition is materially different from the initial petition owing to the joinder of Liberia and jurisdiction over Liberia *ipso facto* affords jurisdiction over the NPA of Liberia.  Furthermore, when jurisdiction over the sovereign will afford jurisdiction over the instrumentality, without more, it is artificial and unnecessary to consider the four Restatement factors to determine "whether 'the issue' in the two proceedings is the same.'"[93]

Even so, as to the third Restatement factor, GSS could not reasonably have been "expected to have advanced the [agency] argument in the first action"[94] when GSS had not named Liberia in the original petition.  And "with respect to the fourth factor, the two actions here" do not "involve the exact same claim,"[95] because the claim against Liberia is materially different from the claim against the NPA of Liberia.  It follows that this Court should not give issue-preclusion effect to the dismissal of GSS's initial claim against the NPA of Liberia.

---

[91]     Addendum at 13-14, *GSS*, 2014 WL 930790 at **4-6.

[92]     Addendum at 12-13, *GSS*, 2014 WL 930790 at *5 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c).

[93]     Addendum at 13, *GSS*, 2014 WL 930790 at *6 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c).

[94]     Addendum at 14, *GSS*, 2014 WL 930790 at *6.

[95]     *Id.*

## III.
## Alternatively, The Court Should Remand The Action To Allow Discovery

Although GSS believes the facts of record support the claim against Liberia pleaded in the amended petition, if there is any doubt then the respondents should respond to GSS's discovery requests and the district court should adjudicate Liberia's amenability to suit in the light of those responses.  *See Foremost-McKesson*, 905 F.2d at 440 (remanding the action for further development of the record concerning the degree of control exercised by Iran over an Iranian dairy company).  The district court recognized that it had "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,"[96] and abused its discretion when it disregarded GSS's discovery requests.

### CONCLUSION

GSS respectfully urges this Court to:

1.    Vacate the judgment dismissing the amended petition and remand the action with directions that the district court adjudicate the merits of GSS's petition to enforce the arbitral awards against Liberia and the NPA of Liberia; or

2.    Alternatively, remand the action with directions that the district court consider the respondents' eventual responses to GSS's discovery requests bearing

---

[96]    Addendum at 17, *GSS*, 2014 WL 930790 at *8, quoting *Foremost-McKesson*, 905 F.2d at 449.

on Liberia's control over the NPA of Liberia incident to the cancellation of the

Project Agreement.

Dated:  July 28, 2014
          Washington, D.C.

                                        Respectfully submitted,

                                        DLA PIPER LLP (US)

                                        /s/ Charles B. Wayne
                                        Charles B. Wayne
                                        500 8th Street, N.W.
                                        Washington, D.C. 20004
                                        (202) 799-4253
                                        (202) 799-5253 (fax)
                                        charles.wayne@dlapiper.com

                                        *Counsel for Petitioner-Appellant*
                                        *GSS Group Ltd.*

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32

I, Stanley McDermott III, a member of DLA Piper LLP (US), counsel for petitioner-appellant GSS Group Ltd., hereby certify that the foregoing main brief complies with the requirements of F.R.A.P. 32(a)(7) and contains 7,404 words and 697 lines including footnotes according to the word count of the word processing system used to prepare it.

_/s/ Stanley McDermott III_
Stanley McDermott III

## CERTIFICATE OF SERVICE

   I hereby certify that I caused the foregoing Brief for Petitioner-Appellant to be served on counsel for Appellees via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity:

Jessica L. Ellsworth
Robert B. Wolinsky
Hogan Lovells US LLP
Columbia Square
555 13th Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
robert.wolinsky@hoganlovells.com

*Attorneys for Respondents-Appellees*

I certify that an electronic copy was uploaded to the Court's electronic filing system.  Eight (8) paper copies of the foregoing Brief for Petitioner-Appellant were sent to the Clerk's Office by Federal Express Next Business Day Delivery to:

Clerk of Court
United States Court of Appeals, District of Columbia Circuit
333 Constitution Avenue, N.W., Room 5423
Washington, D.C. 20001
(202) 216-7300

on this 28th day of July 2014

/s/ Charles B. Wayne
Charles B. Wayne

**ADDENDUM:**
**JUDGE PAUL L. FRIEDMAN'S OPINION**
**DISMISSING THE AMENDED PETITION**
**(MARCH 11, 2014)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
GSS GROUP LTD. (a/k/a GLOBAL SECURITY     )
SEALS GROUP, LTD.),                                    )
                                                              )
              Petitioner,                                   )
                                                              )
       v.                                                     )          Civil Action No. 12-0332 (PLF)
                                                              )
REPUBLIC OF LIBERIA et al.,                       )
                                                              )
              Respondents.                               )
_____ )

OPINION

        This matter is before the Court on the respondents' motion to dismiss petitioner's

Amended Petition for an Order Confirming Foreign Arbitral Award.  Petitioner GSS Group Ltd.

("GSS") seeks confirmation of an award of approximately $44 million issued against respondent

National Port Authority of Liberia ("NPA"), arising from GSS's claim that the NPA breached a

contract under which GSS was to build and operate a container park at the Freeport of Monrovia,

in Liberia's capital city.  GSS's first attempt to confirm its arbitral award — in a separate action

brought before this Court in 2009 — was dismissed for lack of personal jurisdiction over the

NPA, and the D.C. Circuit affirmed that dismissal.

        GSS has now returned to this Court seeking confirmation of the same award, but

this time it has added the Republic of Liberia ("Liberia") as an additional party against which

confirmation is sought, on the theory that the NPA acted as Liberia's agent.  Liberia and the

NPA move to dismiss GSS's amended petition on a number of grounds, including lack of

personal jurisdiction over the NPA, lack of subject matter jurisdiction over the action against

Liberia, improper venue, as well as a number of merits-based grounds.  Based on careful consideration of respondents' motion, petitioner's opposition, respondents' reply, the relevant legal authorities, and portions of the record in this case, the Court will grant respondents' motion to dismiss for two reasons: there is no personal jurisdiction over the NPA, and the Court lacks subject matter jurisdiction over the action against Liberia.[1]

## I.  BACKGROUND

The facts of this case have already been set forth in three judicial opinions: this Court's decision dismissing GSS's original action seeking confirmation of the award against the NPA, GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d 134 (D.D.C. 2011); this Court's subsequent denial of GSS's motion to alter or amend that judgment, GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, Opinion (D.D.C. Aug. 10, 2011); and the court of appeals' affirmance of those decisions, GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d 805 (D.C. Cir. 2012).  Accordingly, this Opinion shall set forth only those facts necessary to establish the essential background.

The NPA "is a public corporation, organized under the laws of Liberia, responsible for the management, operation, and maintenance of Liberia's port facilities." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 808.  Though wholly state-owned, the NPA "operates at some remove from the government itself." Id.  Its organic statute, the National Port Authority Act, establishes that the NPA is a distinct juridical entity with the capacity to enter into contracts and to sue and be sued in its own name. See Public Authorities Law, Ch. VI, § 54(2) (Liberia).

---

[1]    The papers reviewed in connection with the pending motion include: GSS's Amended Petition ("Am. Pet.") [Dkt. No. 6]; respondents' motion to dismiss ("MTD") [Dkt. No. 14]; GSS's opposition ("Opp.") [Dkt. No. 19] and exhibits thereto; respondents' reply ("Reply") [Dkt. No. 22]; GSS's Statement of Claim to Lord Mustill ("Stmt. of Claim") [Dkt. No. 19-3]; and Lord Mustill's Ruling on Jurisdiction ("Ruling on Jurisdiction") [Dkt. No. 6-5].

**ADD-2**

In June of 2005, GSS and the NPA entered into an agreement under which GSS was "to construct and operate a new container park at the Freeport of Monrovia." Am. Pet. ¶ 8. But the following month, a Liberian government agency — the Contract and Monopolies Commission ("CMC") — advised the NPA that its contract with GSS was invalid because it had not resulted from a competitive bidding process, as required under Liberia's Interim Public Procurement Policy and Procedures. Id. ¶ 9; Opp., Ex. 10, at 150 [Dkt. No. 19-6]. Rather than put the contract out for a competitive bid, however, the NPA petitioned the CMC to grant an exemption allowing GSS to be awarded the contract directly, pursuant to a "single-source procurement" arrangement. Opp., Ex. 10, at 154-59. The NPA argued that there was an urgent need to rehabilitate the Port, and that GSS would help further Liberia's compliance with the International Ship and Port Facility Security ("ISPS") Code. Id. The CMC accepted these arguments and granted the exemption. Id. at 160, 176; see also Stmt. of Claim ¶¶ 27-29. GSS and the NPA subsequently signed an amended agreement in August 2005. Am. Pet. ¶ 9; Stmt. of Claim ¶¶ 28-29.

Shortly thereafter, the amended contract between GSS and the NPA came under scrutiny from the International Contact Group of Liberia ("ICGL"). Am. Pet. ¶¶ 30-31. The ICGL was an entity tasked with helping to monitor and enforce the 2003 peace agreement that ended Liberia's civil war, and the United States was among its members. See MTD at 2. In October 2005, the ICGL wrote to the National Transitional Government of Liberia ("NTGL") — which was governing the country until post-war elections could take place — and outlined a number of reasons why the contract between GSS and the NPA caused it "deep concerns." Opp., Ex. 10, at 206-14 [Dkt. No. 19-7]. Specifically, the ICGL noted its reservations regarding the CMC's approval of the exemption permitting the direct award of the contract to GSS, opining

**ADD-3**

that the requirements under Liberia's Interim Public Procurement Policy and Procedures governing single-source procurement arrangements had not been satisfied. Id. at 208-09. The ICGL also cautioned that the agreement represented poor value for money, and that the contract itself suffered from certain technical deficiencies. See id. 209-14. In light of this scrutiny, GSS and the NPA signed an amendment to the contract in an effort to address the ICGL's concerns. See Am. Pet. ¶ 10; Stmt. of Claim ¶¶ 38-39.

Just one month later, however, the Chairman of the NTGL, C. Gyude Bryant, wrote to the Chairperson of the NPA's board, "directing that the GSS contract be cancelled." Opp., Ex. 10, at 263-65 [Dkt. No. 19-8]. Chairman Bryant explained that the government's analysis showed that "the contract as negotiated and concluded places the Port Authority in a grossly disadvantageous position for more than a decade," and that "the contract does not contribute in any material way to compliance with the ISPS regulations." Id. The Chairman directed that any subsequent contract result from a competitive bidding process, and that "proper terms of reference [be] agreed upon and approved by the [CMC] and the technical committee of the [Economic Governance Steering Committee]" of the Governance and Economic Management Assistance Program, an entity established jointly by the ICGL and the NTGL. Id.; see MTD at 2. Subsequently, on January 26, 2006 — following the inauguration of Liberia's post-war elected government, headed by President Ellen Johnson-Sirleaf — the NPA notified GSS by letter that it was cancelling the contract, citing the reasons stated by the NTGL's Chairman in his letter directing cancellation. Opp., Ex. 10, at 273. In a second letter written by the NPA to GSS on February 18, 2006, the NPA's board Chairperson explained that it appeared upon review that the single-source exemption granted by the CMC had been obtained through

"misrepresentation," and therefore the contract was "invalid and null and void ab initio." Id. at 285-87 [Dkt. Nos. 19-8 to 19-9].

GSS initiated arbitration proceedings pursuant to Article VIII of its agreement with the NPA, which provided that disputes arising from it would be arbitrated in London in accordance with the laws of England and Wales. Am. Pet. ¶¶ 11-12. Because the NPA refused to participate, a sole arbitrator was appointed. Id. ¶¶ 12-13. Meanwhile, the Liberian Public Procurement and Concession Commission initiated an action in the Liberian courts seeking a declaration that the GSS contract, as well as its arbitration clause, were invalid. Stmt. of Claim ¶¶ 73-77. In March 2008, the arbitrator, Lord Mustill, determined that he had jurisdiction over the matter notwithstanding the parallel Liberian court action. See Am. Pet. ¶ 14; Ruling on Jurisdiction. Lord Mustill then proceeded to issue an award in GSS's favor on the issue of liability, followed by a damages award in the amount of $44,347,260. Am. Pet. ¶¶ 15-16.

In July of 2009, GSS filed its first petition in this Court seeking confirmation of the arbitral award. The NPA moved to dismiss the petition, arguing, among other defenses, that the Court could not exercise personal jurisdiction over it consistent with due process, given the NPA's lack of "minimum contacts" with the United States. In response, GSS argued that the NPA, as a wholly state-owned enterprise, could not claim the status of "personhood" within the meaning of the due process clause. This Court held, however, that although foreign sovereigns lack such personhood, the NPA "functions more like a private corporation than a foreign government for the purposes of a Fifth Amendment analysis," and it "therefore may not be haled into an American court without having a sufficient quantum of minimum contacts with the United States." GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 141. "Because [GSS] ha[d] not demonstrated, or even attempted to demonstrate, that the [NPA] has *any* contacts with

the United States," the Court concluded that it lacked jurisdiction over the person of the NPA, and, accordingly, GSS's petition was dismissed. Id.

Following the Court's dismissal of the petition, GSS moved to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Its motion raised two arguments that GSS had not advanced in opposition to the NPA's motion to dismiss: (1) that petitions for confirmation of foreign arbitral awards are mere "summary proceedings" and therefore do not infringe on a respondent's due process rights; and (2) that the NPA had acted as an agent of the Liberian government and, therefore, because foreign sovereigns lack due process rights, the NPA was similarly entitled to none. GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 9-10. GSS also sought jurisdictional discovery to develop the factual record regarding the NPA's relationship to the Liberian government. Id. at 9. But this Court concluded that GSS's failure to raise these arguments or to seek jurisdictional discovery earlier in the action meant that these efforts had been waived. Id. at 9-14. GSS appealed, and the D.C. Circuit affirmed the dismissal of the petition. GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 813, 816-17.

The case presently before the Court, GSS contends, "is different from the prior action because it is brought (a) against Liberia as the principal of the NPA of Liberia, and (b) against the NPA of Liberia as the agent of Liberia." Opp. at 1. According to GSS, the significance of these differences is twofold. "First, Liberia will be bound by Lord Mustill's award even though not a signatory to the Contract containing the arbitration agreement. Second, the NPA of Liberia, like Liberia itself, will be subject to this Court's jurisdiction because it will not have a constitutional due process defense to GSS's petition." Id. at 11.

**ADD-6**

Liberia and the NPA move to dismiss the petition on a number of grounds. Among these are jurisdictional grounds — including arguments that the Court lacks personal jurisdiction over the NPA and subject matter jurisdiction over the action against the Republic of Liberia, due to Liberia's sovereign immunity.  MTD at 18-27, 33-47.  In addition, the respondents argue that venue is improper in this forum.  Id. at 47-48.  The respondents also raise a number of merits-based grounds for dismissal, including that: Liberia was not a party to the arbitration agreement or arbitral proceedings; the NPA lacked the capacity to enter into the contract with GSS; the contract is invalid under the laws of England and Wales; the petitioner, GSS, was in fact not a party to the contract; and enforcement of the arbitral award would contravene the public policy of the United States.  Id. at 27-33, 48-62.  Because the Court concludes that the respondents' jurisdictional arguments are dispositive, it will address only those grounds for dismissal.

## II.  DISCUSSION

### A.  The Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act ("FSIA") "is 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'"  Nemariam v. Fed. Dem. Rep. of Ethiopia, 491 F.3d 470, 474 (D.C. Cir. 2007) (quoting Argentine Rep. v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).  "A foreign state enjoys sovereign immunity under the Act 'unless an international agreement or one of several exceptions in the statute provides otherwise,'" and thus, "[i]n the absence of an applicable exception, the foreign sovereign's immunity is complete — [t]he district court lacks subject matter jurisdiction over the plaintiff's case."  Id. (quoting Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 86 (D.C. Cir. 2005)) (internal quotation marks omitted) (alterations in original).  "The Act defines the term 'foreign state'

## ADD-7

expansively.  It includes not only foreign sovereigns, but also any 'political subdivision of a foreign state or an agency or instrumentality of a foreign state.'  And the term 'agency or instrumentality of a foreign state' in turn covers any foreign corporation 'a majority of whose shares . . . [are] owned by a foreign state.'  Because the [NPA] is wholly owned by the Liberian government, it qualifies as an 'agency or instrumentality,' and thus a 'foreign state' for subject-matter jurisdiction purposes." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811 (quoting 28 U.S.C. §§ 1603(a)-(b)) (citations omitted) (alterations in original).

The specific FSIA exception to sovereign immunity through which GSS travels is the so-called arbitration exception, which provides for jurisdiction over efforts to confirm arbitral awards that fall within, among other things, the scope of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). See 28 U.S.C. § 1605(a)(6)(B) ("A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is brought [to enforce an arbitration agreement or award that] is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . . .").[2] Because the NPA was a signatory to the arbitration agreement with GSS, the NPA does not contest the Court's jurisdiction, pursuant to the arbitration exception, over the subject matter of the action against it.  Nor does the NPA contest the existence of a statutory basis for asserting personal jurisdiction over it, as "under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)) (internal quotation marks omitted).  Rather, the jurisdictional disputes in this action concern

---

[2]      As a substantive matter, GSS brings its petition pursuant to the Federal Arbitration Act, which incorporates the New York Convention. See 9 U.S.C. §§ 201-08.

**ADD-8**

(1) whether personal jurisdiction can *constitutionally* be exercised over the NPA, and (2) whether the FSIA's arbitration exception also provides subject matter jurisdiction over GSS's effort to hold Liberia — which was not a signatory to the agreement — responsible for payment of the award on the theory that the NPA served as Liberia's agent.

### B.  The Court Lacks Personal Jurisdiction over the NPA

On GSS's first attempt to confirm its arbitral award, this Court dismissed the petition because it could not constitutionally exercise personal jurisdiction over the NPA.  This holding turned on the conclusion that the NPA, although a wholly state-owned enterprise and therefore a "foreign instrumentality" under the FSIA, nonetheless possessed due process rights. GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 139-41.  Accordingly, given the NPA's lack of minimum contacts with the United States, personal jurisdiction could not be asserted over it.  Id. at 141.  In its motion to alter or amend the judgment, GSS argued that the NPA warranted no due process protection because it had acted as Liberia's agent.  GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 10.  This argument found roots in the D.C. Circuit's decision in TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d 296 (D.C. Cir. 2005), where the court held that "[w]henever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 814-15 (citing TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d at 301-02).  But GSS had failed to raise its agency argument in its opposition to the NPA's motion to dismiss, and, consequently, this Court determined that the argument had been waived under Rule 59(e) of the Federal Rules of Civil Procedure.  GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 10-12.  On appeal, the D.C. Circuit noted that "Rule

**ADD-9**

59(e) motions are aimed at reconsideration, not initial consideration," and agreed with this Court's determination that GSS had waived its agency theory of personal jurisdiction. GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811-13.

GSS now reasserts the same agency argument. See Am. Pet. ¶¶ 17-35; Opp. at 13-14. But the respondents maintain that collateral estoppel, or issue preclusion, "bars GSS from re-litigating whether the Court has personal jurisdiction over the NPA." MTD at 34. The doctrine of "[i]ssue preclusion applies '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" Menkes v. U.S. Dep't of Homeland Sec., 637 F.3d 319, 334 (D.C. Cir. 2011) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)) (second alteration in original). GSS maintains that the issue presently before the Court is not the same as that which was "actually litigated and determined" in the prior action. Specifically, it contends that "[t]he issue now in question is not the issue of personal jurisdiction, viewed broadly, but rather the narrower issue whether the NPA of Liberia is not sufficiently independent of Liberia to warrant possible due process protection." Opp. at 13.

The question, then, is how to characterize the "issue" that was actually decided in the previous action. The respondents argue for a broad view, contending that this Court in its previous decision "framed the issue as 'whether the Constitution permits the exercise of personal jurisdiction over the NPA.'" Reply at 17 (quoting GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 137). As noted, GSS argues for a much narrower definition of the issue previously decided, focusing on the precise grounds of the Court's conclusion that it lacked personal jurisdiction over the NPA — namely, that the NPA is more akin to a private corporation than a foreign government for Fifth Amendment purposes. See Opp. at 13-14; GSS Group Ltd.

v. Nat'l Port Auth., 774 F. Supp. 2d at 141.  On such a narrow view, GSS's argument would not

be precluded, as this Court in its first ruling did not consider the specific legal theory now being

pressed by GSS — that the NPA acted as Liberia's agent, thus stripping it of due process

protection — because it had not been raised.

        Our court of appeals has made clear, however, that "[a] new contention is not . . .

necessarily a new issue" for purposes of issue preclusion analysis.  Yamaha Corp. of America v.

United States, 961 F.2d 245, 257 (D.C. Cir. 1992) (quoting JAMES WM. MOORE, JO DESHA

LUCAS & THOMAS S. CURRIER, 1B MOORE'S FEDERAL PRACTICE ¶ 0.443[2] at 760-61 (1988))

(omission in original).  Rather, "once an *issue* is raised and determined, it is the entire *issue* that

is precluded, not just the particular arguments raised in support of it in the first case."  Id. at 254

(citing Securities Indus. Ass'n v. Board of Governors, 900 F.2d 360, 364 (D.C. Cir. 1990), and

RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c).

        The court of appeals in Yamaha applied this principle to hold that the appellant,

Yamaha-America, was precluded from arguing that its trademark rights under the Lanham Act

were violated by the importation of so-called "gray market" goods produced by Yamaha-Japan,

where this ultimate issue had previously been decided against Yamaha-America in a decision by

the Ninth Circuit.  Yamaha Corp. of America v. United States, 961 F.2d at 256-58.  Although in

its second suit Yamaha-America sought to advance an argument that admittedly had not been

considered by the Ninth Circuit — that the imported products bore physical differences from

those sold by Yamaha-America in the United States — the D.C. Circuit held that because

Yamaha-America could have presented evidence of physical differences to the district court in

its first action, it was barred from doing so in its second lawsuit.  As the court explained,

"Yamaha-America failed properly to introduce evidence of 'physical differences' in the [first]

**ADD-11**

litigation, and it is precluded from relitigating the issue of its rights under [the Lanham Act] based on this 'new' evidence."  Id. at 258.

The D.C. Circuit relied on this same principle in Hall v. Clinton to conclude that where a court previously had determined that the Civil Service Reform Act "constituted the sole remedy for [the defendant's] conduct" — thus preempting the plaintiff's conspiracy claim under 42 U.S.C. § 1985 — the judgment precluded the plaintiff from bringing common law tort claims that had not been considered in the first action.  See Hall v. Clinton, 285 F.3d 74, 80-81 (D.C. Cir. 2002).  The court of appeals noted that "Hall's common-law tort allegations in this litigation are not new issues but simply new *legal theories*."  Id. at 81.  It explained that "[b]ecause [Hall's] contention that Clinton committed common-law torts against her is 'relevant to the issue[] that [was] litigated and adjudicated previously,'" she therefore was barred from relitigating the preemption issue.  Id. (quoting Yamaha Corp. of America v. United States, 961 F.2d at 257-58) (some alterations in original).

There are limits to this approach, of course.  "Once issue preclusion operates as to matters that merely 'should have been litigated,' . . . it becomes difficult to identify a useful distinction between the principles and purposes of issue preclusion and broader preclusion doctrines."  18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4417, at 431 (2d ed. 2002).  "Unchecked expansion of issue definition . . . may lead to unthinking preclusion on matters that should be tested against concepts of claim or defendant preclusion without any pretense that they have been litigated and resolved in a prior action."  Id. at 432.[3]  "The problem involves a balancing of important

_____

[3]       The respondents have not argued for the application of claim preclusion, which, as noted by Wright, Miller, and Cooper, sweeps more broadly than does issue preclusion.  Under claim preclusion, as explained by our court of appeals, a subsequent lawsuit may be barred if it raises "the same claims or cause of action," where "there is an identity of the causes of action

**ADD-12**

interests: on the one hand, a desire not to deprive a litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute." RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (discussing the "[d]imensions of an issue").

The Restatement offers further guidance for situations where "there is a lack of total identity between the particular matter presented in the second action and that presented in the first," resulting in a need to determine whether "the 'issue' in the two proceedings is the same." See RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c. Four factors are to be considered: whether there would be "a substantial overlap between the evidence or argument" advanced in the two actions; whether "the new evidence or argument involve[s] application of the same rule of law as that involved in the prior proceeding"; whether "pretrial preparation and discovery" in the first action might have "embraced the matter sought to be presented in the second"; and the degree of relatedness between the claims in the two proceedings. Id.

In GSS's first action before this Court, GSS neglected to argue that the NPA had acted as Liberia's agent and therefore enjoyed no due process rights. When GSS did raise this theory in its motion to alter or amend the judgment, this Court concluded that it had done so belatedly and refused to consider the argument. GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 10-12. The D.C. Circuit agreed. GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811-13. It is clear, however, that GSS could have made the argument from the outset, and that this legal theory is relevant to the issue that was in dispute in the first action — namely, whether personal jurisdiction could be had over the NPA despite its lack of any contacts with the United States. See Yamaha Corp. of America v. United States, 961 F.2d at 257-58. In addition, the last two Restatement factors support the application of issue preclusion

when the cases are based on the same nucleus of facts." Capitol Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC, 569 F.3d 485, 490 (D.C. Cir. 2009) (internal quotation marks omitted).

**ADD-13**

in these circumstances.  The third factor essentially asks whether the plaintiff could be expected to have advanced the argument in the first action; as already explained, GSS could have done so, yet did not.  And with respect to the fourth factor, the two actions here involve the exact same claim.  In short, the fact that GSS enjoyed every opportunity to rely on a theory of agency when it earlier litigated the issue of personal jurisdiction over the NPA — yet, "[f]or unknown reasons . . . elected not to [make that argument]," GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 139 — warrants the application of issue preclusion to bar GSS from relitigating this issue.

In any event, as the remainder of this Opinion will explain, GSS's agency argument also fails on its merits.  Therefore, even if GSS were not barred from advancing its agency theory as a basis for asserting personal jurisdiction over the NPA, the Court would still conclude that the NPA enjoys due process rights that, given its lack of any contacts with the United States, foreclose the exercise of personal jurisdiction over it.

### C.  The Court Lacks Subject Matter Jurisdiction over GSS's Action Against Liberia

#### 1.  Applicable Principles

Although GSS is barred from arguing that personal jurisdiction may be had over the NPA based on a theory of agency, the identical argument must be addressed in the context of GSS's effort to confirm the award against Liberia.  This is because the test applied by the D.C. Circuit to determine when a foreign instrumentality loses due process protection, premised on the nature of its relationship to its parent government, see TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d at 301-02, applies equally to determine when an instrumentality's actions provide the basis for the exercise of subject matter jurisdiction, pursuant to the FSIA, over an action against the sovereign itself.  See Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905 F.2d 438, 445-49 (D.C. Cir. 1990).

**ADD-14**

The principle underlying this inquiry stems from the Supreme Court's decision in First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"), where the Court held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." Id. at 626-27. This presumption of independent status can be overcome in two circumstances: (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," id. at 629, and (2) where treating the instrumentality as an entity distinct from its sovereign "would work fraud or injustice." Id. (quoting Taylor v. Standard Gas Co., 306 U.S. 307, 322 (1939)).

The D.C. Circuit has further elucidated these two grounds for disregarding a foreign instrumentality's independent status. The first ground — "the agency exception" — can be founded on either of two different concepts: control or apparent authority. See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 848-50 (D.C. Cir. 2000).[4] And the concept of control is itself "relevant in two distinct contexts." Id. at 848. "First, control is relevant when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary." Id. "Second, control is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent; in that case control renders the sovereign amenable to suit under ordinary agency principles." Id. at 849. As to the second point, the court in Transamerica recognized that "[c]ourts have long struggled" to apply the principles of agency law, as "[t]he

_____

[4]     The court in Transamerica expressed "doubt, however, that a case of merely apparent authority falls within the agency exception — an exception limited by its terms to situations in which the instrumentality 'is so extensively controlled by [the sovereign] that a relationship of principal and agent is created.'" Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 850 (quoting Bancec, 462 U.S. at 629) (alteration in original). Moreover, GSS advances no argument based on apparent authority; the Court therefore will not discuss the concept.

**ADD-15**

question [of how much control is required before parent and subsidiary may be deemed principal and agent] defies resolution by mechanical formula[e]." Id. (final alteration in original). In spite of these difficulties, the court of appeals nevertheless could "confidently state that the relationship of principal and agent does not obtain unless [1] the parent has manifested its desire for the subsidiary to act upon the parent's behalf, [2] the subsidiary has consented so to act, [3] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and [4] the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." Id. (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958)).

The second ground for overcoming the presumption of independent status is where failure to do so would work a fraud or injustice. In Bancec, the Supreme Court applied this principle and held that the respondent's separate juridical identity should be disregarded. The case had been initiated by Bancec, a credit institution and instrumentality of the Cuban government, to collect on a letter of credit issued by First National City Bank ("Citibank"). Bancec, 462 U.S. at 613-14. Citibank counterclaimed and sought a setoff for the value of assets that had been seized by the Cuban government as part of a nationalization program. Id. The Supreme Court held that Bancec was not entitled to its presumption of independent status where it was clear that "the Cuban Government [itself] could not bring suit in a United States court without also subjecting itself to its adversary's counterclaim," and where, due to the fact that "Bancec was dissolved even before Citibank filed its answer," "the Cuban Government and [its central bank] . . . would be the only beneficiaries of any recovery." Id. at 630-32. The Court explained that its decision resulted from "the application of internationally recognized equitable

**ADD-16**

principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." Id. at 633.

### 2. Analysis

Preliminarily, GSS argues that "the issue whether [] Liberia was the principal of the NPA of Liberia is a mixed question of law and fact, and therefore cannot be resolved on a Rule 12(b)(6) motion." Opp. at 2-3; id. at 13 ("GSS's petition and the additional evidence provided by GSS in response to Respondents' motion are sufficient to raise a triable issue concerning Liberia's control over the NPA."). Although GSS is correct to note that resolution of this question turns on issues of fact, it is wrong to suggest that the respondents' instant motion fails to provide the Court with an appropriate opportunity to address it. On a motion to dismiss for lack of subject matter jurisdiction — which is brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure, not Rule 12(b)(6) — "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).

More particularly, "to address a motion to dismiss under Rule 12(b)(1) where the suit involves a foreign sovereign and the court's jurisdiction over the sovereign is contested, the district court must do more than just look to the pleadings to ascertain whether to grant the motion to dismiss," and the court therefore "has 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" Foremost-McKesson v. Islamic Rep. of Iran, 905 F.2d at 449 (quoting Prakash v. American Univ., 727 F.2d 1174, 1179 (D.C. Cir. 1984)). In addition, "the *plaintiff* bears the burden of asserting facts sufficient to withstand a

17

# ADD-17

motion to dismiss regarding the agency relationship." Id. at 447.  Elsewhere in its brief, GSS
appears to concede this point by referencing its having served discovery requests and noticed
depositions aimed at "complet[ing] the record concerning Liberia's relationship with the NPA."
Opp. at 9.  If these efforts have produced any relevant information, GSS has not placed it before
the Court.  In any event, both parties have contributed to the construction of a factual record
concerning the relationship between Liberia and the NPA, and the Court will rely on that record
in evaluating whether it has subject matter jurisdiction over the action against Liberia.

      In its Amended Petition and its opposition brief, GSS contends that Liberia's
relationship to the NPA is characterized by the following links.  First, GSS asserts that the
NPA's board of directors "is wholly dominated and controlled by the President of Liberia."
Am. Pet. ¶ 17.  To support this assertion, GSS points out that the board's members are largely
appointed by the President of Liberia, and that among these members sit three government
ministers.  Id. ¶ 18.  Second, GSS contends that the economic interests of the NPA and the
Republic of Liberia are one and the same.  Id. ¶¶ 23-27.  Evidence of this alignment is said to be
found in the fact that "[t]he port infrastructure managed by the NPA of Liberia subject to
government oversight is critically important to Liberia's economic well-being."  Id. ¶ 23.  In
addition, the NPA is required to submit annual reports to the President, describing how "[its]
actions . . . fulfill its charter on Liberia's behalf."  Id. ¶ 25.  GSS further highlights the fact that
Liberia has absorbed some of the NPA's debts, as well as that "all of the NPA of Liberia's rights
and properties will vest in Liberia should the Liberian legislature terminate the NPA."
Id. ¶ 26-27.

      Third, GSS points to a 2010 Concession Agreement executed between the NPA
and APM Terminals Liberia, Ltd. — which, apparently, constitutes the port management

**ADD-18**

arrangement that superseded the cancelled GSS contract — executed "on behalf of the NPA" not only by the Chairperson of the NPA's board, but also by several government ministers and by Liberia's President herself.  Am. Pet. ¶¶ 19-21.  The Concession Agreement provides, in part, that "notices in respect of the NPA" be provided to these various officials.  Id. ¶ 22.  GSS contends that these factors present "compelling corroborating evidence that the Government of Liberia controls all important decisions on the part of the NPA of Liberia, including decisions on matters such as the Concession Agreement that are of critical importance to Liberia's economy."  Opp. at 8.

Finally, GSS emphasizes the role that Liberia played in causing the NPA to breach its agreement with GSS.  According to GSS, the NPA "cancelled the [agreement] acting under the control and direction, and pursuant to the instructions, of the NTGL, and hence Liberia."  Am. Pet. ¶ 33.  GSS argues that Liberia's having directed the NPA to cancel the deal demonstrates a level of control that satisfies the standard for "complete domination" and also satisfies the elements applicable under "ordinary agency principles."  Opp. at 11.  In addition, GSS contends that "not enforcing the award against Liberia would constitute manifest 'injustice' in circumstances where Liberia directed the NPA of Liberia to cancel the Contract."  Id. at 12.

The respondents argue that none of these links establish that Liberia dominated the NPA or that the NPA acted as the government's agent under ordinary principles of agency law; they therefore maintain that the presumption of the NPA's independence must remain intact.  MTD at 18-27; Reply at 1-13.  The Court agrees.  The facts cited by GSS do not demonstrate that the NPA was "so extensively controlled by [Liberia] that a relationship of principal and agent [was] created."  See Bancec, 462 U.S. at 629.  Nor does the record support a conclusion that recognizing the NPA as a distinct juridical entity would work an injustice.

# ADD-19

For guidance, the Court looks to the D.C. Circuit's decision in <u>Transamerica</u>, where the court of appeals considered a litany of facts on which the district court had relied in concluding that a principal-agent relationship existed between Venezuela and its wholly-owned instrumentality, a shipping company called CAVN. The court of appeals determined, however, that this relationship was not close enough to overcome the presumption of CAVN's independent status. <u>See</u> <u>Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d at 847-54. The plaintiffs in <u>Transamerica</u> were a group of companies that had leased equipment to CAVN, and they alleged that CAVN breached its lease agreements when it failed to keep its payments current, eventually going bankrupt. <u>Id</u>. at 845-46. The action was brought against the government of Venezuela, which argued that its sovereign immunity insulated it from suit. <u>Id</u>. at 847. The plaintiffs contended that jurisdiction over the action was proper under the FSIA's commercial activity exception — the commercial activity being the contract and CAVN's alleged breach — on the theory that Venezuela exercised a sufficient degree of control over CAVN to render CAVN its agent. <u>See id</u>. at 845-47.

The district court in <u>Transamerica</u> had made five factual findings on which it based its conclusion that Venezuela was amenable to suit: "Venezuela (1) owned a majority of CAVN's stock; (2) appointed the Board of Directors and the Chairman of the Board and President; (3) was involved in CAVN's 'day-to-day' operations by overseeing the restructuring of CAVN's intermodal operations and approving the sale of three of CAVN's vessels; and (4) aided CAVN financially by allowing [another Venezuelan instrumentality] to enter into a trust agreement with CAVN; while (5) the President of CAVN, with apparent authority to bind Venezuela, assured one of the plaintiffs that the Government would support CAVN." <u>Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d at 850-51. The D.C. Circuit

methodically addressed each of these findings and explained why "the facts as found, considered as a whole, establish[ed] neither that Venezuela dominated CAVN nor that CAVN was Venezuela's actual or apparent agent." Id. at 851.

The court of appeals acknowledged that facts one and two — establishing that Venezuela owned a majority of CAVN's stock and that it controlled the composition of the board — were "relevant," but "as a matter of law [they did] not by themselves establish the required control." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851 (citing Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905 F.2d at 448). As to the third set of facts found by the district court, the Circuit disagreed with the court's assessment that these facts demonstrated Venezuela's control over CAVN's day-to-day operations. With respect to the board's appointment of a Venezuelan naval officer as chief of CAVN's new "Intermodal Division," the court viewed this as "describ[ing] nothing more than the sole shareholder exercising its influence, through the Board of Directors, to put its own chosen manager in charge . . . and leaving to him the task of running 'day-to-day' operations." Id. As to the finding that "Venezuela [had] authorized the sale of three of CAVN's vessels," id., the court of appeals made two points. First, it noted that "the sale of a portion of its fleet as part of a massive restructuring hardly qualifies as CAVN's 'day-to-day' business." Id. Second, it observed that such authorization might have been provided by Venezuela not as shareholder, but rather as government regulator. Id.

The fourth set of findings made by the district court related to Venezuela's "financial involvement" with its instrumentality. Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851-52. The district court found that Venezuela had provided capital infusions into CAVN and had created a trust agreement under which CAVN was beneficiary, all

to enable CAVN to "satisfy its debts and attain liquidity." Id. at 852.  But the court of appeals cited Bancec for the proposition that government appropriations to instrumentalities constitute "a normal aspect of the relation between a government and a government-owned corporation, not an instance of 'day-to-day' involvement in the affairs of the corporation." Id.  The fifth factual finding related to a theory of apparent authority that is not relevant to the present inquiry, as GSS has not advanced such an argument here.

This Court will likewise consider each of GSS's proffered facts in turn.  First, GSS points out that the NPA's board is composed almost entirely of appointees of the President of Liberia.  Although governmental control of the board is relevant, it is far from dispositive, as GSS acknowledges.  See Opp. at 8 (citing Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851).  And as in Transamerica, "the remaining factors do not make up the shortfall."  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851.

GSS next contends that "the NPA of Liberia's economic interests are Liberia's economic interests." Am. Pet. at 6.  But this characteristic likely describes virtually all state-owned enterprises; governments establish instrumentalities such as the NPA precisely to achieve the economic goals of the state.  See Bancec, 462 U.S. at 624-25 (noting that the "distinctive features [possessed by] government instrumentalities . . . frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments").  If this were not so, governments would not expend funds from the public fisc to keep these enterprises capitalized — something that Liberia has done for the NPA, and which "reflect[s] only a normal relationship between a sovereign and an instrumentality of the state."  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 852 (citing Bancec, 462 U.S. at 624).  Similarly,

the Court fails to see how the fact that the NPA's assets would vest into Liberia's possession upon the NPA's dissolution proves anything more than that it is a state-owned entity.  Indeed, that its property would vest in the state *upon its dissolution* only underscores that the NPA presently holds title to its own property.

GSS also points to the 2010 Concession Agreement between the NPA and another port terminal operator, which was signed by several Liberian government officials and which includes provisions requiring that "notices in respect of the NPA" be provided to the government.  Am. Pet. ¶¶ 19-22; Opp. at 8.  First, as the respondents argue, the nature of the NPA's relationship to its parent government with respect to a contract executed several years after the transaction at issue cannot shed light on any relationship of agency that may have existed when GSS and the NPA entered into their own agreement.  See MTD at 22 n.13; Reply at 12-13.  Moreover, even if the 2010 agreement were relevant, GSS fails to offer any persuasive argument as to how the government's co-signing the contract and its being kept apprised of "notices in respect of the NPA" demonstrate the sort of extensive control necessary to disregard the NPA's distinct corporate identity.

Finally, GSS emphasizes the fact that the NPA cancelled its agreement with GSS at the direction of the Chairman of the National Transitional Government of Liberia.  See Am. Pet. ¶¶ 28-35; Opp. at 3-6, 10-12.  According to GSS, the fact that the Liberian government directed the NPA to cancel the contract demonstrates a level of control sufficient to render Liberia amenable to suit under each of the "distinct contexts" recognized by the D.C. Circuit in Transamerica: complete domination and ordinary principles of agency law.  See Opp. at 11.  In addition, GSS contends that even if this Court were to disagree with its arguments under the agency exception, Liberia would still be amenable to suit because "not enforcing the award

**ADD-23**

against Liberia would constitute manifest 'injustice' in circumstances where Liberia directed the NPA of Liberia to cancel the Contract." Id. at 12. On each of these points, however, GSS offers almost nothing in the way of argument or citation to authority to explain how this one instance of control satisfies the standard set out in Bancec, a standard which demands a showing of "extensive[] control[]" to overcome the presumption that the NPA's independent status should be respected. See Bancec, 462 U.S. at 629. Rather, GSS states in conclusory fashion that complete domination is "evident here in Liberia's direction that the NPA of Liberia cancel the Contract," and that "[t]here is also no serious question" that Liberia's action satisfies the "conventional principal-agent standard with the 'principal having the right to control the conduct of the agent with respect to the matter entrusted'" to it. Opp. at 11. (quoting Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 849) (internal quotation marks omitted).

Complete domination results where a sovereign's control over an instrumentality "significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary," such that "the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 848. But as the preceding analysis has demonstrated, GSS has not shown anything approaching such domination of the NPA by Liberia — which might entail, for example, the government's management of day-to-day "routine business decisions," see id. at 853 — and the single example of control at issue here cannot alter that conclusion.

As to "ordinary agency principles," GSS's argument hinges on the third element identified by the court in Transamerica, namely that the principal possess the right to control its agent's conduct with respect to the matter entrusted to it. See Opp. at 11. The "matter" entrusted to the NPA for purposes of this analysis, GSS appears to contend, is the execution of

**ADD-24**

the specific contract at issue here.  See id. at 6.  But again, GSS offers no reasoning or authority

to elucidate why this one instance of control should suffice to give rise to an agency relationship

between Liberia and the NPA.  In addition, GSS fails to explain how the first two elements of the

principal-agent standard have been met on these facts; indeed, there is no indication that

"[Liberia] manifested its desire for [the NPA] to act upon [its] behalf" in engaging a new port

manager, nor that the NPA "consented so to act."  See Transamerica Leasing, Inc. v. La

Republica de Venezuela, 200 F.3d at 849; see also id. at 853 ("Venezuela did not evince an

intent to have CAVN act as its agent in dealing with the plaintiffs.").  In fact, the course of

events preceding the NTGL's direction to cancel the deal demonstrates that the NPA acted

independently in negotiating and executing the contract with GSS, pursuant to its mission and in

exercise of the legal rights endowed to it by its organic statute.

       Moreover, the letter sent to the NPA by the Chairman of Liberia's transitional

government, directing that the contract be cancelled, appears more likely to be an instance of the

sovereign acting as government regulator rather than as corporate parent.  See Transamerica

Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851 (recognizing this distinction, and

stating that "it is not uncommon for a government — as regulator, not as shareholder — to

require approval for certain transactions in the transportation sector").  As the record evidence in

this case demonstrates, the NTGL's direction that the NPA cancel its deal with GSS arose from a

course of events in which Liberia's Contract and Monopolies Commission first halted the

contract for violation of competitive bidding regulations and later granted an exemption from

these rules.  But after the amended agreement came under further scrutiny from Liberia's

transitional government and its international advisors, the contract was ordered to be cancelled,

with instructions that the NPA's future efforts to engage a port manager be conducted in

**ADD-25**

accordance with competitive bidding and other relevant regulatory standards.  These circumstances bear the hallmarks of a government exercising its regulatory authority to ensure conformity to law, rather than those of a shareholder conducting business through an agent who acts on the shareholder's behalf and subject to its plenary control.

Finally, GSS offers a single sentence of support for its argument that failure to hold Liberia to account for the NPA's breach would work an injustice, given that the contract's cancellation was ordered by the Liberian government.  Opp. at 12.  Injustice has been found to result where a foreign sovereign intentionally seeks to gain a benefit while using the corporate status of its instrumentality as a shield to guard against concomitant costs or risks, see Bancec, 462 U.S. at 630-33, where a sovereign otherwise unjustly enriches itself through the state-owned enterprise, see Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 854, or where a sovereign uses a state-owned corporation to defeat a statutory policy.  See id.  It is not at all apparent that any of these conditions is present on the facts of this case, and GSS has put forth no argument to the contrary.

**ADD-26**

### III.  CONCLUSION

Because this Court cannot constitutionally exercise personal jurisdiction over the NPA, GSS's petition with respect to it must be dismissed.  In addition, because the Republic of Liberia is entitled to sovereign immunity, GSS's effort to confirm its arbitral award against Liberia fails for lack of subject matter jurisdiction.  Accordingly, GSS's Amended Petition for an Order Confirming Foreign Arbitral Award is dismissed in its entirety.  An appropriate Order accompanies this Opinion.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  March 11, 2014

**ADD-27**